UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GREGORY P. HARHAY and | ) | |
| ANNE E. HARHAY, | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-30229-MAP |
| | ) | |
| | ) | |
| NOAH H. STARKEY and | ) | |
| GERTRUDE M. STARKEY, | ) | |
| Defendants | ) | |

REPORT AND RECOMMENDATION WITH REGARD TO DAMAGES and
DEFENDANTS' MOTIONS TO DISMISS (Document Nos. 161, 162, 166, 167 and 177)
August 26, 2010

NEIMAN, U.S.M.J.

In a detailed Memorandum and Order dated May 10, 2010, District Judge

Michael A. Ponsor granted a motion for default judgment filed by siblings Gregory

Harhay and Anne Harhay (together "Plaintiffs") against their sister, Defendant Gertrude

Starkey. The other defendant, Noah Starkey, Gertrude Starkey's husband, previously

had a default judgment enter against him. Judge Ponsor then referred the matter to

this court for a hearing on damages against both Starkeys (together "Defendants"). At

the hearing, on July 7, 2010, both Plaintiffs testified as did their handwriting expert;

Defendants, however, failed to appear. The court is now poised to recommend,

pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b), that certain damages

be awarded Plaintiffs and that Defendants' various motions to dismiss, also referred to

the court for reports and recommendations, be denied.

I. BACKGROUND

The court finds it unnecessary to provide much additional history than explicated by Judge Ponsor in his May 10, 2010 Memorandum and Order.  Suffice it to say, Plaintiffs' claims for damages arise out of Defendants' fraud and roles as fiduciaries of the estate and/or assets of three other relatives:  (1) Plaintiffs' and Gertrude Starkey's mother, Gertrude Harhay (hereinafter "Gertrude"); (2) one of Gertrude's sisters, Yvette D'Amour (hereinafter "Yvette"); and (3) another of Gertrude's sisters, Anne Marie D'Amour (hereinafter "Anne Marie").  Gertrude, Yvette and Anne Marie were also sisters to Paul and Gerald D'Amour, founders of the Big Y Supermarket chain.

It is, however, important to note two caveats set forth in Judge Ponsor's decision.  First, he indicated that the default judgment did "not entirely strip Defendant[s] of the right to participate in this action," *e.g.*, by "raising *legal* objections to claims contained in the complaint by way of a motion brought, for example, pursuant to Fed. R. Civ. P. 12(b)(6)" or by claiming "that the statute of limitations provides a complete defense to a particular claim."  (Mem. & Order at 19.)  Second, he explained that Defendants had "the right to dispute and present evidence at a hearing regarding the amount of damages."  (*Id.* at 20.)

Defendants, apparently, have chosen to take the court up on the first caveat by filing several motions to dismiss.  As noted, however, they failed to attend the July 7, 2010 damages hearing, despite notice and despite the fact that at least two of the motions to dismiss by Gertrude Starkey (Documents No. 161 and 162) -- together with an Objection to the Introduction of Any Exhibits at the Hearing in Damages (Document No. 164) and a Hearing in Damages Memorandum (Document No. 165) -- were hand-

filed at the Clerk's Office just moments before the hearing was to commence.  Another

motion to dismiss (Document No. 166) was filed by Defendant Noah Starkey on July 8,

2010, a duplicate of that motion (Document No. 167) was filed on July 13, 2010, and

yet another motion to dismiss (Document No. 177) was filed on August 9, 2010.  Also,

on July 30, 2010, Gertrude Starkey filed a Motion to Strike Memorandum in Support of

Assessment of Damages (Document No. 176) and just yesterday, August 25, 2010,

Noah Starkey filed his own Motion to Strike Memorandum in Support of Assessment of

Damages (Document No. 180).  In any event, the salient testimony and evidence from

the damages hearing is described more fully below.

## II. DISCUSSION

The court's discussion has two parts.  First, because they raise threshold issues,

the court will consider Defendants' various motions to dismiss and recommend that

they all be denied.  Second, the court will turn to the question of damages and will

conclude that, in fact, certain damages and attorney's fees should be awarded

Plaintiffs.

### A. MOTIONS TO DISMISS

In the court's view, Defendants' various motions to dismiss (Document Nos. 161,

162, 166, 167 and 177) can be dealt with in short order.  The court will address the

motions in groups, recommending that they all be denied, and then discuss why the

court this day has denied Gertrude Starkey's Objection to the Introduction of any

Exhibits at the Damages Hearing (Document No. 164) as well as Defendants' two

Motions to Strike Memorandum in Support of Assessment of Damages (Document Nos.

176 and 180).

    1. <u>Document Nos. 166 and 167</u>

    As Plaintiffs point out in their opposition, two of Noah Starkey's motions to dismiss (Document Nos. 166 and 167) raise identical arguments previously presented by Gertrude Starkey and rejected by Judge Ponsor.  Specifically, Noah Starkey, like his wife, claims that the court lacks subject matter jurisdiction by virtue of the "probate exception" to federal jurisdiction.  In his May 10, 2010 decision, however, Judge Ponsor denied Gertrude Starkey's motion because "the probate exception cannot be used 'to dismiss "widely recognized tort[s]" such as breach of fiduciary duty or fraudulent misrepresentation merely because the issues intertwine with claims proceeding in state court.'" (Mem. & Order at 12-13 (quoting *Lefkowitz v. Bank of N.Y.*, 528 F.3d 102, 108 (2d Cir. 2007)) (in turn, quoting *Marshall v. Marshall*, 547 U.S. 293, 312 (2006)).  "All of Plaintiffs' claims," Judge Ponsor continued, "sound in tort and seek an *in personam* damages judgment against the Defendants themselves." *Id.*  Given Judge Ponsor's ruling, the court will recommend that Documents Nos. 166 and 167 be similarly denied.

    2. <u>Document No. 162</u>

    For similar reasons, the court will recommend dismissal of one of Gertrude Starkey's motions to dismiss (Document No. 162) wherein, as in previous filings, she attacks Plaintiffs' "fraudulent litigation conduct."  While the particular assertions in Gertrude Starkey's present motion are somewhat distinct -- claiming, among other things, that certain pretrial disclosures were backdated, that certain mailings by Plaintiffs' counsel were one day later than certified, that postage had been tampered

with, and that one of Plaintiffs' attorneys was not an employee of the other attorney's firm but a solo practitioner -- her assertions reflect the same kind of diversionary arguments previously addressed and rejected by Judge Ponsor.[1]   More importantly perhaps, Gertrude Starkey's present assertions, even if credited, do not call for the outright dismissal of Plaintiffs' action.   Accordingly, the court will recommend that Document No. 162 be denied.

    3.  Document Nos. 161 and 177

    The court will also recommend that the remaining motions to dismiss (Document Nos. 161 and 177) be denied as well.   In one remaining motion (Document No. 161), Gertrude Starkey essentially seeks to have the court dismiss all the claims against her: Counts 2 (negligent interference with property), 4 (intentional and malicious interference with property), 6 (negligent infliction of emotional distress, 8 (intentional infliction of emotional distress), 10 (bad faith), 12 (conversion), 14 (fraudulent concealment), 16 (fraud), 18 (negligence), 20 (negligent misrepresentation), 22 (intentional misrepresentation), and 24 (breach of fiduciary duty).   She asserts that each count sounds in fraud or alleges injuries that result from fraud but lacks the particularity required by Fed. R. Civ. P. 9(b).   In a separate but basically indistinguishable motion (Document No. 177), Noah Starkey seeks dismissal of the counts arrayed against him (Counts 1, 3, 5, 7, 9, 11, 13, 15, 17, 19, 21, 23, and 25.)

    Even assuming that all the counts cited sound in "fraud," as Defendants suggest,

---

    [1]  For example, when Gertrude Starkey raised similar arguments to open and set aside the default judgment (Document No. 159), that motion was summarily denied. (See June 23, 2010 Elec. Order.)

the facts asserted in Plaintiffs' verified complaint, in the court's opinion, provide

sufficient particularity to meet the requirements of Fed. R. Civ. P. 9(b) such as to have

apprised Defendants of the claims against them.  For example, the complaint alleges

that, from 2000 to 2007, Defendants together exercised dominion and control as

fiduciary and attorney respectively relative to certain described probate estates, that

during that time Defendants were the primary source of information to Plaintiffs as to

the status of their interests in those estates, but that Defendants provided

misinformation, failed to account for all interests and property, deliberately

misrepresented the status of assets, and concealed and converted assets to their own

use.  (See, *e.g.*, Compl. ¶¶ 14-34.)  The complaint also alleges that in July of 2007,

Plaintiffs demanded full disclosure of the missing assets whereupon it became clear to

them that Defendants, acting in concert, had converted and withheld assets for their

own use.  (*Id.* ¶ 35.)  Given its specificity, the complaint satisfies the fraud standards

which Defendants now seek to interpose.  Accordingly, the court -- without addressing

still other arguments raised by Plaintiffs in opposition, including timeliness -- will

recommend that Document Nos. 161 and 177 be denied as well.

    4.  <u>Document Nos. 164, 176 and 180</u>

    Finally, the court has this day denied Gertrude Starkey's Objection to the

Introduction of any Exhibits at the Damages Hearing (Document No. 164), her Motion to

Strike Memorandum in Support of Assessment of Damages (Document No. 176), and a

parallel Motion to Strike Memorandum in Support of Assessment of Damages

(Document No. 180) filed by Noah Starkey.  In essence, Defendants raise two

objections.  First, they complain about the "hasty" scheduling of the hearing without the court first inquiring about their availability or "scheduling conflicts."  They do not claim, however, that they were unable to attend the damages hearing.  Indeed, as described, Gertrude Starkey filed the instant objection -- either by herself or through her husband -- moments before the hearing was to commence.  Nonetheless, Defendants failed to appear personally to voice any concerns directly with the court.

Second, Defendants fault the court for not resolving "outstanding" pre-trial issues before proceeding with the damages hearing.  In particular, they cite previously interposed objections -- based on timeliness and vagueness -- to the admissibility of certain evidence identified by Plaintiffs in pre-trial disclosures filed in February and March of this year.  (See Document Nos. 114 and 118.)  What Defendants fail to understand if not appreciate, however, is that Judge Ponsor effectively dealt with all outstanding pre-trial issues when, on May 10, 2010, he denied Gertrude Starkey's motion to dismiss, granted Plaintiffs' motion for default judgment, and canceled both the status conference scheduled for May 24, 2010, and the trial scheduled for June 7, 2010.  Simply put, there were no outstanding pre-trial issues before the court when the damages hearing went forward.

This should come as no surprise to Defendants.  After having addressed countless motions brought by the parties, this court, on March 15, 2010, noted that Defendants had not filed any motions for summary judgment by the February 1, 2010 deadline and, accordingly, reminded the parties to comply with the Procedural Order entered on February 27, 2009, and to appear before Judge Ponsor on March 29, 2010,

7

for a pretrial conference. Plaintiffs' Motion for Default Judgment was filed on March 17, 2010, and their Disclosures and Pretrial Memorandum were filed, respectively, on March 18 and 22, 2010. On March 22, 2010, this court denied Gertrude Starkey's Motion for Leave to File Discovery Related Motion (Document No. 120) as well as Plaintiffs' Motion to Strike Defendant's Answer and Affirmative Defense (Document No. 116). At the same time, the court reminded Gertrude Starkey of her obligation to send copies of certain emails directly to Plaintiffs' counsel, rather than to the court alone, but nonetheless docketed the emails as a courtesy to her. The next day, citing the pretrial conference scheduled for March 29, 2010, this court denied Gertrude Starkey's Motion for Extension of Time to March 31, 2010, to Oppose Plaintiffs' Motion for Default (Document No. 126) and directed her to file her opposition by March 26, 2010. She did. After yet additional documents and motions were filed by the parties, Judge Ponsor went forward with the pretrial conference on March 29, 2010, denied Plaintiffs' motion for default judgment, without prejudice, on condition that Gertrude Starkey comply by April 9, 2010, with this court's previous order of November 30, 2009. In addition, Judge Ponsor directed Plaintiffs to file their opposition to Gertrude Starkey's Motion to Dismiss by April 19, 2010. Thereafter, as described, Judge Ponsor issued his Memorandum and Order on May 10, 2010. In all, this has been an exhaustive process which endeavored to protect the parties' various procedural rights throughout, including Defendants being given sufficient time to address the issues raised by Plaintiffs' motions for default.

In any event, all that was left after Judge Ponsor's May 10, 2010 ruling was for

this court to conduct a damages hearing, while preserving Defendants' right, as described by Judge Ponsor, "to dispute and present evidence at a hearing regarding the amount of any damages to be awarded to Plaintiffs."  As indicated, Defendants did not avail themselves of that opportunity and the court proceeded to hear testimony and consider documentary evidence introduced by Plaintiffs.  Accordingly, for these reasons and more, Gertrude Starkey's Objection to the Introduction of any Exhibits at the Damages Hearing (Document No. 164) as well as Defendants' Motion to Strike Plaintiffs' Memorandum in Support of Assessment of Damages (Document Nos. 176 and 180) have all been denied this day.

B.  DAMAGES

    The question of damages is a little less straightforward.  Before actually recommending an award of damages, however, the court will first tackle certain thorny burden of proof and inferences issues.  Then, the court will describe applicable trust principles.  Finally, the court will consider the various categories of Plaintiff's alleged damages.  Throughout, the court will remark, as appropriate, on the evidence adduced at the damages hearing.

    1.  Burden of Proof and Inferences

    In their Memorandum in Support of an Assessment of Damages (Document No. 160), Plaintiffs assert that Defendants' mutual failure to provide certain requested documents during the course of discovery, together with Noah Starkey's failure to appear for a deposition, has limited their ability to fully support their claim for damages. This, of course, has also presented a problem for the court.

9

As has been noted elsewhere, "[c]ourts have long struggled with determining how damages should be measured where the evidence revealing that amount has been lost." *United Med. Supply Co., Inc. v. United States*, 77 Fed. Cl. 257, 275 (Fed. Cl. 2007).  In such circumstances, the Court of Federal Claims asked, should it take the "highest value" approach, as was done in "the fabled 'Chimney Sweep's Jewel Case,'" *Armory v. Delamarie*, 1 Str. 505, 93 (Eng. Rep. 664 (K.B. 1722)), or make the "best possible estimate" of value, the approach followed in *Fox v. Hale & Norcross Silver Mining Co.*, 41 P. 308, (Cal. 1895)?  *Id.*[2]  Answering the question as "neither," the court instead fashioned a sanction deemed appropriate for the case before it, namely, requiring the defendant to reimburse the plaintiff for any additional discovery-related costs and limiting cross examination of the plaintiff's expert by the defendant.  *See id.* at 275-76.

Unfortunately, such creative sanctions will not entirely resolve the absence of certain evidence in the case at bar.  For one thing, this court's prior imposition, twice, of monetary penalties against Noah Starkey has simply been disregarded by him and, hence, has been of little remedial effect.  Second, Defendants, by failing to appear at the damages hearing, have already precluded themselves from cross-examining not

---

[2]  In *Armory*, the plaintiff-chimney sweep bailed a jewel with the defendant jeweler.  *See id.*  When the jeweler failed to return the jewel, the court ruled that unless the jeweler "'produce[d] the jewel, and shew it not to be of the finest water, [the jury] should presume the strongest against him, and make the value of the best jewels to measure of [the plaintiff's] damages.'"  *Id.* (quoting *Armory*, 1 Str. 505).  In *Fox*, the court held "that the value of silver ore which was wrongfully mined, but for which records were lost, was to be ascertained by making the best possible estimate of its value, rather than assuming it was the most valuable silver ore possible."  *Id.* (citing *Fox*, 41 P. at 323).

only Plaintiffs but, as well, their handwriting expert, who testified about Gertrude's signature on a durable power-of-attorney; as a result, the court is free to consider the expert's testimony without objection.  Still, this does not cure the problem caused Plaintiffs and the court by Defendants' withholding of both documentary and testimonial evidence.

Understanding these limits, Plaintiffs maintain that, in addition, the court cannot only draw fair inferences from such evidence as has been presented but negative inferences as well from what Plaintiffs maintain has been the spoliation of evidence by Defendants.  *See Testa v. Wal-Mart Stores, Inc.*, 144 F.3d 173, 177 (1st Cir. 1998) ("[A] trier of fact may (but need not) infer from a party's obliteration of a document relevant to a litigated issue that the contents of the document were unfavorable to that party.") (citing cases).  To be sure, the court has little direct proof -- other than perhaps Gertrude's forged signature on the durable power-of-attorney -- that Defendants have in fact destroyed or altered relevant evidence.  *See id.*  ("[T]he sponsor of the inference must proffer evidence sufficient to permit the trier to find that the target knew of (a) the claim (that is, the litigation or the potential for litigation), and (b) the document's potential relevance to that claim.").  *Accord Booker v. Ma. Dep't of Public Health*, --- F.3d ---, 2010 WL 2776627, at ** 8-9 (1st Cir. July 15, 2010).  Nonetheless, in light of all the circumstances, Defendants' resistance to the *production* of evidence, in the court's opinion, calls for the type of adverse inferences as are usually imposed for the *spoliation* of evidence.

This approach was impliedly approved, if not suggested, by the First Circuit in

11

*Nation-Wide Check Corp. v. Forest Hills Distrib., Inc.*, 692 F.2d 214 (1st Cir. 1982). As the court there explained, "[t]he general principles concerning the inferences to be drawn from the loss or destruction of documents are well established." *Id.* at 217. "When the contents of a document are relevant to an issue in a case," the court stated, "the trier of fact generally may receive the fact of the document's *nonproduction* or destruction as evidence that the party which has prevented *production* did so out of the well-founded fear that the contents would harm." *Id.* (empasis added). Hence, an adverse inference can be drawn "based on two rationales, one evidentiary and one not." *Id.* at 218. The evidentiary rationale calls for "the existence of a fact at issue [to be] more probable than it would otherwise be." *Id.* The prophylactic rationale, which might deter a party from destroying relevant evidence before it can be introduced at trial, can also serve "as a penalty, placing the risk of an erroneous judgment on the party that wrongfully created the risk." *Id. See also Kronisch v. United States*, 150 F.3d 112, 126-127 (2d Cir. 1988) (same).

Here, both rationales support the adverse inference that the documentary evidence withheld by Defendants would support at least some of the damages claimed by Plaintiffs. *See also West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) (spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation"). The documentary evidence which was not produced includes not only bank and estate records, but Noah Starkey's testimony, his having failed to subject himself to a deposition. The more specific application of the adverse inferences will be noted

12

below.

2. Trust Principles

In addressing this issue of damages, the court has also taken into account the fiduciary positions held by Defendants vis-a-vis Plaintiffs.  At a minimum, Noah Starkey was the attorney for Anne Marie's estate (Plaintiffs' Exhibit 4) and Gertrude Starkey was executrix of her mother Gertude's estate (Plaintiffs' Exhibit 5).  (See also Affidavit of Steven R. Weiner, Exhibit D.)  Plaintiffs were among the beneficiaries of those estates.  Noah Starkey was also named, supposedly, as the attorney-in-fact in Gertrude's durable power-of-attorney.  (Plaintiffs' Exhibit 1.)  Plaintiffs have also proven by a preponderance of the testimonial evidence that Defendants held themselves out more generally as fiduciaries working for Plaintiffs' benefit with relation to the various assets of Gertrude, Anne Marie and Yvette.

Accordingly, the court has taken into account the "long-standing" principle in trust law "that once the beneficiary has shown a breach of the trustee's duty and a resulting loss, the risk of uncertainty as to the amount of the loss falls on the trustee." *Confederated Tribes v. United States*, 248 F.3d 1365, 1371 (Fed. Cir. 2001) (citing *Armory*).  This principle is equally applicable to fiduciaries, as echoed by the Second Circuit:

> Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these.  The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty.  Any doubt or ambiguity should be resolved against them.

*Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985).

In light of the defaults entered against them, this trust principle would require Defendants, as fiduciaries, to prove any set off.  Having failed to attend the damages hearing, however, Defendants have not taken on this burden.  In contrast, Plaintiffs, as was true in *Confederated Tribes*, have established not only the breach via the default judgment but, for the reasons which follow, "some loss."  *Id.*, 248 F.3d at 1372.  As explained below, the court believes that Plaintiffs have supported certain of their claims for damages in ways which are not too speculative.  *Id.* ("The only question is whether the proof of loss was too speculative to support any recovery at all.").

3.  Analysis of Damages

Despite the numerous and varied counts asserted in their complaint, Plaintiffs' claims, as set forth in their memorandum (Document No. 160), appear limited to damages arising from Defendants' various breaches of fiduciary duty and fraud with regard to the following:  (1) a residual trust in Anne Marie's estate, (2) real property owned by their mother Gertrude, (3) other assets of Yvette and Anne Marie, *i.e.*, Anne Marie's Merrill Lynch account and a People's Bank account related to Anne Marie's estate, and (4) attorneys' fees in the context of Plaintiffs' claim under Mass. Gen. L. ch. 93A against Noah Starkey.  The court will consider these categories in turn.[3]

---

[3]  Little, if any, mention is made in Plaintiffs' memorandum of their claims for emotional distress damages.  Granted, Plaintiffs did mention such at the damages hearing, but they provided neither documentary evidence (*e.g.*, medical bills) nor adequate supporting testimony in this regard.  Accordingly, despite some upset which Plaintiffs may well have experienced, the court will recommend that no damages for emotional distress be awarded to them.

a. *The Residual Trust*

Plaintiffs' residual trust claim refers to that part of Anne Marie's will which called for allocation of her residual estate -- after distribution of her "tangible property" to her sister, Gertrude, as well as to Gertrude's children, Plaintiffs and Gertrude Starkey -- as follows:  $20,000 to Gertrude, $90,000 to Gregory Harhay, $80,000 to Anne Harhay, and $80,000 to Gertrude Starkey.  (Plaintiffs' Exhibit 4.)  Anne Marie died on December 30, 1999.

Notwithstanding this allocation, no such residual amounts were ever distributed, at least to Plaintiffs, despite the fact that as of September 28, 2001, nearly two years after her death, the net portfolio value in Anne Marie's Merrill Lynch account alone, controlled by Noah Starkey, was $392,655.  (Plaintiffs' Exhibit 14.)  That amount, however, was rapidly depleted to $524 by December 31, 2002.  (*Id.*)  In the interim, monthly cash values declined by $20,000 in October 2001, $160,000 in December 2001, $3,000 in February 2002, $20,000 in April 2002, and $6,000 in May 2002, although there was one increase in cash value of approximately $5,000 in January 2002.  (See *id.*)  Additional cash of approximately $165,500 became available in June of 2002 from the sale of more than $202,000 in government securities then held in the account.  (*Id.*)  However, that cash too was quickly depleted by more than $120,000 in July of 2002, $26,000 in August of 2002, $14,500 in September of 2002 and, finally, $4,000 in October of 2002, when all that remained in the entire account, as mentioned, was $524.  (See *id.*)  Although afforded the opportunity, neither Defendant has ventured to explain this breathtaking drop in value.

To be sure, Anne Marie's will called for the Trustee of the Estate (apparently Yvette herself or a niece, Marie D'Amour, as a substitute) -- after distribution of the tangible property and prior to the deduction of the residuary estate -- to pay "so much of the net income of the Trust Estate as the Trustee, in the Trustee's sole discretion, may deem necessary or appropriate to provide comfortable support, maintenance, medical expenses and hospital or other institutional care" for her sister Yvette for the remainder of her life. (*Id.*)  The will also enabled the Trustee to invade the principal if the income was insufficient to provide such support and maintenance to Yvette. (*Id.*) Yvette, it should be noted, died on March 7, 2006.

There is nothing to indicate, however, that there was any need to invade the principal of Anne Marie's estate, let alone its net income, to provide for the support of Yvette for the years following Anne Marie's death.  Absent further documents related to Anne Marie's estate at the time of Yvette's death, the court draws the inference and concludes, based on the documentary evidence provided that, at Yvette's death, there was more than sufficient assets left in Anne Marie's estate to pay the residual amounts to Plaintiffs, if not to Gertrude Starkey herself.  (Plaintiffs' and Gertrude Starkey's mother, Gertrude, it should be noted, died on January 9, 2004, so the $20,000 residuary distribution otherwise due her lapsed.)  Accordingly, the court will recommend that the residual amounts due Gregory Harhay ($90,000) and Anne Harhay ($80,000) be awarded to them as damages based on Defendants' fraud and breach of fiduciary duties with respect to the residual trust.

As it turns out, these damages are relatively modest given the documentary

16

evidence which exists concerning not only Anne Marie's assets but Yvette's as well.

Yvette had a checking account at Fleet Bank (No. 612) from at least June of 2003 (at

which time it had a balance of $11.35) through July of 2004.  (Plaintiffs' Exhibit 9.)  On

June 26, 2003, however, there was a large deposit ($94,208.66), the source of which is

uncertain.  (See *id.*)  Nonetheless, the account was entirely depleted by the end of July

2004 (at which time it had a balance of $78.12) sometimes by checks in relatively small

amounts, *e.g.*, $322, $402.50 and $149.50, other times by checks of significantly

greater amounts, for example, $23,658, $5,000, $4,550.32, $3,400, $3,500, $12,500,

$4,500, $9,287 and $1,400, the purposes of which are uncertain.  (*Id.*)  In other words,

Yvette had access to a significant amount of cash after she survived Anne Marie.  It

should also be noted that Defendants' son Noah *H.G.* Starkey, had Yvette's power-of-

attorney the entire period of time, that is, from February 26, 2000, through December of

2005.  (Plaintiffs' Exhibits 12 and 13.)

Plaintiffs also make reference to another Fleet Bank checking and savings

account (No. 916) in the name of Anne Marie and Yvette (Plaintiffs' Exhibit 10),

although Anne Marie had died prior to the dates on the monthly statements introduced

into evidence.  These records, too, show that Yvette had significant funds available to

her without any apparent need to access the corpus of Anne Marie's estate.  (See *id.*)

For example, the evidence shows an account balance of approximately $11,500 on

April 5, 2003, with additional deposits that month of over $52,000 and checks drawn

thereon of $17,636.  (*Id.*)  An additional deposit of approximately $2,000 was made the

following month, but $36,400 was expended through checks.  (*Id.*)  The account was

depleted to $2,400 by July 7, 2003 and $3,000 by August 6, 2003, but was replenished

later in August by two significant deposits of nearly $110,500 each.  (*Id.*)  In

September, however, a check in the amount of $110,000 plus other checks totaling

over $6,000 were written on the account.  (*Id.*)  Thereafter, from October of 2003

through January 7, 2004, the balance on the account fluctuated between $104,000 and

$91,000, but in January a deposit of $2,000 was more than offset by checks written on

the account totaling nearly $56,000.  (*Id.*)  Another $103,000 was deposited in

February of 2004, counterbalanced by nearly $30,000 in checks that month.  (*Id.*)

Another $57,000 in checks were written in March and nearly $40,000 in April, $18,000

in May, leaving a balance on June 4, 2004, of $1,825.64.  (*Id.*)  Again, Defendants' son,

Noah H.G. Starkey, had Yvette's power-of-attorney this entire time.

Finally, there were also checking and savings accounts at People's Bank (Nos.

861, 906, 279 and 337) in the name of Anne Marie's Estate with Yvette as Executrix.

(Plaintiffs' Exhibit 15.)  The records presented cover November of 2002 through April of

2003.  (See *id.*)  The beginning balance was nominal, but in December of 2002 there

were deposits of $31,800 and checks written thereon totaling nearly $16,400.  (*Id.*)  By

August 8, 2003, however, there was an ending balance of only $2,000.  (*Id.*)  Again,

Noah Starkey was the attorney for Anne Marie's estate and his son held Yvette's

power-of-attorney during this period.

It should also be noted that Yvette's real estate at 47 Dowds Lane in Chicopee,

which she had owned jointly with Anne Marie, had substantial value as well.  It was sold

for $255,750 on December 8, 2005, three months before her death, by Noah H.G.

Starkey, Defendants' son, pursuant to the power of attorney.  (Plaintiffs' Exhibit 12.)  As far as Plaintiffs know, whatever assets composed Yvette's estate at the time of her death simply disappeared into the ether.  Her estate has never been probated nor has a will been probated.

### b.  *Gertrude's Property at 26 John Street, Chicopee*

The court separately addresses Gertrude's property at 26 John Street in Chicopee.  At the outset, the court notes that Gertrude's signature on a durable power-of-attorney dated October 22, 2002, was shown by a preponderance of the evidence, through the testimony of Plaintiffs' qualified handwriting  expert, to have been forged. (See Plaintiffs' Exhibit 2.)  The document is purported to have been witnessed by Gertrude Starkey and to have appointed Noah Starkey as attorney-in-fact.[4]

To be sure, the expert's testimony was hampered somewhat by the absence of original documents, causing him to conclude that the signature, as compared to Gertrude's exemplar signatures, was *probably* written by a different hand, rather than reaching a *high probability* for that conclusion.  Nonetheless, the uncontested evidence has convinced the court that the signature was not Gertrude's.

This finding is important because the durable power-of-attorney served as the instrument which enabled Noah Starkey, as the purported attorney-in-fact, to transfer Gertrude's property at 26 John Street to his and Gertrude Starkey's daughter, Anne S.

---

[4]  The court notes as well that the signature in question is not located in the correct location, *i.e.*, over the line denoted "principal."  (*Id.*)  Rather, it is located in the signature line reserved for the notary public.  (*Id.*)  In turn, the notary public's signature appears on a "witness" line.  (*Id.*)

Lamonica, and her husband, David R. Lamonica, for $125,000 on June 16, 2003.

(Plaintiffs' Exhibit 1.)  This was approximately six months prior to Gertrude's death.

Three years later, on August 29, 2006, the Lamonicas sold the property for $230,000.

(Plaintiffs' Exhibit 8.)  Had the value of the property been split as Plaintiffs testified their

mother Gertrude intended, one-half would have gone to Gregory Harhay and one-half

to Gertrude Starkey, Anne Harhay having previously received monies from her mother

for the purchase of her own home.  Gregory, however, received nothing from the sale of

the property.  Accordingly, the court will recommend that damages of $115,000 be

awarded Gregory Harhay, which amount more accurately reflects one-half the true

value of the property, *i.e.*, the August 29, 2006 sale price.

        c. *Other Assets of Yvette and Anne Marie*

        What is, perhaps, most startling about Plaintiffs' documentary and testimonial

evidence is the fact that they received nothing from the estates of their aunts Yvette

and Anne Marie or from their mother Gertrude's estate, given not only the close

relationship Plaintiffs had with each of them (see Plaintiffs' Exhibit 3) but, as described,

the significant level of assets which both Anne Marie and Yvette had during their

lifetimes.  To be sure, Gregory acknowledges that, during his aunts' lifetimes, he may

well have received $250,000 from them, their having kept meticulous records while

alive.  (See Plaintiffs' Exhibit 3 ¶ 33.)  Whether similar distributions had been made to

other nieces and nephews is unknown.  Still, as indicated, Plaintiffs never received the

residual amounts specified in Anne Marie's will, they received nothing when Yvette

died, there being no probate of her estate and no will produced during this litigation,

and they received nothing upon the sale of their mother's house one-half year before her death or from her estate.

Given this history, Plaintiffs make claim to "equitable" portions of the various bank and money market accounts previously in Anne Marie's and Yvette's names, accounts which Plaintiffs claim were pilfered in one way or another by Defendants. For example, Plaintiffs assert that the value of the Merrill Lynch account ($374,000) at one time would have been split in thirds between Plaintiffs and Gertrude Starkey. Plaintiffs argue for the highest value of that account and all other accounts before damages are awarded.

The court, however, is unable to calculate what portions, if any, were truly available when Yvette, who survived Anne Marie, died and, given the lack of a probated estate, what amounts if any would have been coming Plaintiffs' way upon her death. It may well be that Defendants absconded with those assets, but the court cannot engage in such speculation when assessing damages. Unfortunately for Plaintiffs, there is too little evidence upon which the court can base such a damages award.

Even the sale for $255,750 of Yvette's and Anne Marie's property three months prior to Yvette's death provides little upon which the court can rely. First, it was sold by Defendants' son, Noah H.G. Starkey, as Yvette's attorney-in-fact; however, he is not a party to this lawsuit and there has been no evidence that he somehow operated as Defendants' agent-in-fraud. Second, even though the court believes that there ought to have been sufficient assets for the residuary estate of Anne Marie to be distributed at

the time of Yvette's death, there is no evidence that any additional monies were either available from Yvette's estate or meant to be distributed to Plaintiffs.

        d.  *Chapter 93A attorneys' fees*

Finally, as Plaintiffs argue, the court believes they are entitled under Mass. Gen. L. ch. 93A to an award of attorneys' fees and costs against Noah Starkey in his capacity as an attorney. These fees, according to Plaintiffs, amount to $15,017.50, together with $1,310.66 in costs. (Plaintiffs' Exhibit 17.) It should be noted that these amounts include the attorney's fees previously awarded as sanctions by the court but unpaid by Noah Starkey.

## III. CONCLUSION

For the reasons stated, the court recommends the dismissal of Defendants' various motions to dismiss (Documents Nos. 161, 162, 166, 167 and 177). In addition, the court recommends that damages be awarded to Plaintiff Anne Harhay and against Defendants in the amount of $80,000 (the residual estate award) and to Plaintiff Gregory Harhay and against Defendants in the amount of $205,000 ($90,000 as the residual estate award plus $115,000 representing one-half the value of his mother's house). In addition, the court recommends that $16,328.16 in attorneys' fees and costs be awarded Plaintiffs against Defendant Noah Starkey, together with such other fees and costs as may have been incurred subsequent to Plaintiffs' attorney's submission of his supporting affidavit on July 4, 2010.[5]

---

[5] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P. 59(b), any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within fourteen (14) days** of

DATED: August 26, 2010

/s/   Kenneth P. Neiman
KENNETH P. NEIMAN
U.S. Magistrate Judge

the party's receipt of this Report and Recommendation.  The written objection must
specifically identify the portion of the proposed findings or recommendations to which
objection is made and the basis for such objection.  The parties are further advised that
failure to comply with this rule shall preclude further appellate review by the Court of
Appeals of the District Court order entered pursuant to this Report and
Recommendation.  *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275
(1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v.
Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-
79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir.
1980).  *See also Thomas v. Arn*, 474 U.S. 140, 154-55 (1985).  A party may respond to
another party's objections within fourteen (14) days after being served with a copy
thereof.